UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE 461 7 TH AVE MARKET, INC.

                Debtor.

                  18-22671-RDD

                  Chapter 11

461 7TH AVE MARKET, INC., and
YOUNG IL PARK,

                Plaintiffs,

       vs.

                  Adv. Pro. No. 18-08265-rdd

DELSHAH 461 7TH AVENUE, LLC,
DELSHAH CAPITAL, and MICHAEL
SHAH,

                Defendants.

## DEBTOR'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR "PERMISSIVE ABSTENTION" OF ALL CLAIMS

Michael S. Kimm, Esq. (MK4476)
KIMM LAW FIRM
333 Sylvan Avenue, Suite 106
Englewood Cliffs, New Jersey 07632
T: 201-569-2880
msk@kimmlaw.com
*Attorneys for Plaintiff*s

Rosemary Matera, Esq.
KURTZMAN MATERA, P.C.
664 Chestnut Ridge Road
Spring Valley, New York  10977
Tel 845-352-8800
rmatera@kmpclaw.com
Attorneys for Chapter 11 Debtor

## INTRODUCTION

1. Plaintiffs 461 7th Ave Market, Inc., and Young Il Park, operate a "mom and pop" delicatessen at the Northwest corner of 35th Street and Seventh Avenue in Manhattan. They entered into the lease, and committed to a significant investment of capital, money, and time in January 2011, when these defendants were not the building owner. Since entering into a leasehold interest at the ground-floor store space in January 2011, plaintiffs have been "model tenants" according to the landlord, Timothy O'Brien who sold his family's property to Michael Shah in May 2015. Plaintiffs have never defaulted in the payment of rent or in discharging any other obligations under the lease. Plaintiffs have never been cited for any building code violation by the City of New York Department of Buildings (DOB).

2. In May 2015, Michael Shah purchased the two-story building, with a single tenant, intending to evict the existing tenant so as to raise rent and bring a "better image" to the property, while awaiting an opportunity to speculate on the possible high-rise development that might take shape at that property. Michael Shah knew that Macy's had been planning to possibly sell off one-half of its sprawling one-square block property (minus small buildings, including this one), as it had announced in 2013.

3. Even before closing title on the property in May 2015, Michael Shah envisioned the store space being occupied by a name-brand tenant, who would also use a large billboard, yet to be erected on the roof, and thereby enhance the revenue stream, while awaiting a condominium redevelopment. As soon as he acquired the building, Michael Shah organized a team of lawyers specializing in tenant-eviction practice; a team of architects and engineers

1

specializing in finding minutia "violations" of the Building Code.  Together they embarked

upon a scheme and artifice to destroy the plaintiffs' leasehold rights by alleging that they had

been "in breach" since 2009 — six years before Michael Shah came to acquire the property.

## THE PARTIES

4. Plaintiff 461 7th Ave Market, Inc. ("Market"), is an entity organized in New York.

This entity operates an eating establishment and is commonly called a "deli" or delicatessen

where food  and drinks are served quickly throughout the day.   Market is the only tenant in the

building.

5. Market is owned by Young Il Park, a Korean immigrant, who works stressful hours

to keep the business going, and to be a responsible tenant.

6. Defendant Delshah 461 7th Avenue, LLC, is believed to be a business entity

organized in New York to own and operate the building at 461 7th Avenue.

7. Defendant Delshah Capital is believed to be a related entity through which funding

is moved for benefit of defendants.

8.  Defendant Michael Shah, a lawyer and real estate speculator, is believed to be a

resident in New York who operates the entities essentially under his primary direction to

accomplish his business goals.

## THE FACTS COMMON TO ALL CLAIMS
## IN THE ADVERSARY ACTION

9. In order to understand the current situation between the "landlord" and "tenant," a

historical context is relevant.  According to a December 2017 statement of the prior landlord,

Timothy O'Brien, the tenant has been a model tenant during the entire term that he had known

them, i.e., from January 2011 when plaintiffs became a tenant, and May 2015, when the

landlord changed.  Even as to renovations and alterations in the building, O'Brien, in an affidavit

dated January 13, 2018, was laudatory about the tenant:

> 3.     The original lease for the Premises was executed on or about July 2003, between my mother, Mary Jane Medicus O'Brien and my uncle, John Delmour Medicus, as Landlord, and 461. Inc., as Tenant (the "Lease").

> 4.     Pursuant to an Assignment and Assumption of Lease, dated December 5, 2004, 461, Inc. assigned the Lease to Median Farm, Inc. (the "First Assignment").  Said Lease was amended by conditional Amendment dated December 21, 2010 between Timothy O'Brien as Executor of the Estate of John Delmour Medicus and as agent for Mary Jane Medicus O'Brien, Landlords, and 461 7th Avenue Market, Inc. (incoming Assignee).

> 5.     Pursuant to an Assignment and Assumption of Lease, dated January 5, 2011, the Lease was assigned by Median Farm, Inc. to Plaintiff (the "Second Assignment").

> 6.     Before the property was sold to the new owner on May 15, 2015, all alterations done to the Premises by or on behalf of the tenant were approved or not objected to by the Landlord.

> 7.     On or about January 24, 2011, in consideration of Lessee (Plaintiff) undertaking to perform improvements to the Premises, I provided the Plaintiff with a monetary contribution of $20,000.00 on behalf of the Landlord to be utilized towards the costs of improvements at the subject Premises.  The Plaintiff in fact completed the improvements to the subject Premises, and to my knowledge and belief.  The areas of renovation include the staircase; the roof (equipment being placed upon the roof); and other parts of the property.  <u>At all times, the tenant discharged its responsibilities in a reasonable and diligent fashion and was a good tenant.</u>

> 8.     To my knowledge and belief, there were no objections asserted by or on behalf of the Landlord to any improvements made by the Plaintiff or any previous Tenant during the term of the subject Lease (up to and including the date of May 15, 2015) and in fact, consent was affirmatively given when

3

requested by the Tenant. All consent given to tenant was permanent and not conditional.

9.      The foregoing statements are true and made under the penalties of perjury, except as to those matters which are stated to be upon information and belief and as to those matters I believe the statements made to be true and accurate.

Exhibit 1.

10. On January 20, 2011, plaintiffs thus became the new tenant at the store premises and continued to operate an eating establishment that had existed there for years.  The tenant paid rent in a timely manner; was a responsible tenant; and no allegation of "breach" was ever made or even hinted.  Not only was the tenant a responsible tenant, the landlord too was a fair and reasonable landlord, who did not have his own agenda.  That changed in May 2015 when the building was acquired by a new landlord, Michael Shah, as he specifically intended to evict the current tenant and install a "better" tenant who would operate a brand name business and also use the roof for a flagship billboard to promote the brand business.

**Michael Shah's Premeditated Scheme to Evict the Tenant**

11. On November 6, 2013, The Real Deal, a real estate industry journal, published a story:

**"Macy's $400M makeover will balloon Herald Square flagship"**

Macy's flagship store on 34th Street is getting a $400 million makeover. The four-year renovation project will be completed in 2015 and will add 100,000 square feet of retail space to the store, bringing the total retail space in the store to 1.2 million square feet.

The renovation project will also redo the store's 111-year-old façade and add 47,000 square feet of new marble, the New York Times reported. "To continue

4

to grow the brand, we needed to elevate the store experience," Terry Lundgren, the store's CEO, told the newspaper. "That meant adding new brands and creating a luxury component that we didn't have before."

Macy's, which also owns Bloomingdale's, had a tough second quarter, according to the Times, with its reported earnings of $281 million falling well short of analysts' expectations for the first time in more than six years. [NYT] – Hiten Samtani

Exhibit 2.

12. Shortly after acquiring the building in early May 2015, in a May 22, 2015 article,

Michael Shah gave an interview to The Real Deal who reported:

**Delshah scoops up Herald Square retail building**
**Developer beat out Macy's for the property**
By Claire Moses | May 22, 2015 05:35PM

Michael Shah's Delshah Capital closed on the purchase of a Herald Square retail building on the corner of West 35th Street and Seventh Avenue for $14 million, The Real Deal has learned.

The two-story, 2,760-square-foot property is located adjacent to Macy's in Herald Square. The department store was interested in the property as well, Shah said, but the developer moved "extremely fast" to close. The building is one of only two on the block that is not owned by Macy's.

Shah told TRD that the property at 461 Seventh Avenue lends itself to being a flagship store for a retail tenant. The outside of the building itself would serve as a billboard for the brand, he said.

It's still unclear who will occupy the space. A Korean deli is currently located there.

"Delshah's flexible capital and ability to move quickly was a differentiating factor in this acquisition," Jeff Bogino, managing director of Delshah, said in a statement.

Capital Source provided $9 million in funding for the project.

5

Shah, who is developing a Chelsea condo building at 221 West 17th Street, said he envisions substantial changes on Seventh Avenue in the coming years.

Parts of Seventh Avenue in that area are currently sloppy, he said.

But, Shah continued, "it's going to be awesome."

Exhibit 3 (emphasis added).

13. On June 3, 2015, in the Commercial Observer, an online news journal, in a directly-quoted interview format of interview-marketing, Michael Shah claimed that his "burgeoning real estate empire . . . is worth $500 million," mostly from foreclosures and government-backed real estate programs. Exhibit 4.

14. Less than three years later, on March 14, 2018, in another interview-marketing format presented in the Commercial Observer, Michael Shah claimed that his "portfolio of New York City real estate assets [is] approaching $1 billion in value . . . ." Exhibit 5.

15. It was widely speculated within the real estate industry that Macy's $400 million renovations would attract larger customer crowds and result in an appreciable increase in property values in and around the Macy's Herald Square area.  Just as the Macy's $400 million makeover was completing, it appears that Michael Shah purchased the property from the prior owner Timothy O'Brien at a price of $14 million.  In the process it was reported in the media that Michael Shah had even outbid Macy's.

16. When Michael Shah came to know that he had outbid Macy's, by paying $14 million for the building, as reported in The Real Deal, he knew that Macy's wanted the property for something close to his bid.  Having acquired a prize, for the remaining 7 months of 2015 and

all of 2016, Michael Shah's ownership.

17. On January 17, 2017, plaintiff received a purported "30 day notice to cure" from Michael Shah, containing a litany of alleged "violations" most of which are matters that had been directly or indirectly approved by the prior landlord, Mr. O'Brian. This purported "notice to cure" was not a real notice to cure that a landlord would send to a tenant, when they are engaged in a working, cooperative landlord-tenant relationship, of the kind that existed between the prior landlord, Mr. O'Brien and plaintiff. Instead, it was a pretext for manufacturing a "breach" allegation which would then support an eviction claim against a hard working store owner.

18. Just six weeks before the "notice to cure," on November 10, 2016, The Real Deal reported that the Macy's Herald Square store was also a potential property to be "re-developed" as a morphed condominium or office developments or both. The article stated:

> **Macy's teams up with Brookfield to develop store locations**
> **Retailer is still considering options with properties in New York City**
>
> November 10, 2016 12:01PM
>
> With sales continuing to slide, graying retailer Macy's is teaming up with Brookfield Asset Management to evaluate options for developing real estate at some 50 store locations.
>
> The department store said on its quarterly earnings call Thursday that it will sell stores in San Francisco and downtown Portland, and will continue to weigh options for locations in Minneapolis, Chicago and New York City, Forbes reported.
>
> Earlier this year, Macy's tapped Eastdil Secured TRData LogoTINY to market partnership stakes in several properties, including its iconic Herald Square location. That was after selling its Downtown Brooklyn store at 422 Fulton

7

Street to Tishman Speyer for $170 million.

<u>Meanwhile, Macy's will work with Brookfield to explore redeveloping existing stores or strips of unused land</u>. These locations will mostly be owned and ground-leased in shopping malls that are not owned by big-time mall operators, according to Forbes.

Macy's, like many of its competitors, has been struggling amid a tough retail environment. The company has had to close more than 100 locations and lay off employees in order to cut costs.

Net income in the third quarter fell to $17 million, down from $118 million the same time last year. [Forbes] – Rich Bockmann

<u>Exhibit 6</u> (emphasis added).

19. Michael Shah had no shortage of lawyers representing him in Rosenberg & Estes including Bradley Silverbush and Richard Corde and others; he had two in-house attorneys supporting the Rosenberg lawyers.  He had a team of architects and engineers whose job it was to identify minutia of alleged violations on the property and they had to look far back into the history of the property.

20.  From that point, when they served the initial 30 day notice, to the date of plaintiff Market's commencement of its Chapter 11 case, the relationship between landlord and tenant has been one of "prey" and "the preyed."

## DEFENDANTS' SHAM NOTICES OF VIOLATIONS

21. When Michael Shah purchased the property from Timothy O'Brien for $14 million, he purchased the property "as is." <u>Exhibit 7</u>; Section 5, at Bates page 586.  The Rider to the Contract contains a more specific clause, "Condition of Premises," that confirms that Michael

Shah had a full and fair opportunity to inspect the premises and is buying the building "as is."
Exhibit 8; Section 21, Bates 596.  Everything that Michael Shah has done in his effort to oust the plaintiffs has been dishonest to the "as is" purchase, where he knew about the 2009 through 2015 alterations and accepted them "as is."

22. Michael Shah purchased the building knowing that there was a food service tenant in the store since 2011, a classic mom and pop deli/café that was trying to make an honest living for the family of Mr. Park.  Yet, as shown by the underlined, quoted statements in the media, Michael Shah had already intended, even before the closing of title on the property, that the store would be serving as a "flagship store" for some famous brand that would also use the roof space for a billboard advertising, thus creating, in effect, a store-plus-billboard package. To attract and install a Gucci or whatever, he needed the deli to be removed.

23. When the 30 day notice to quit came in January 2017, the deli retained counsel, Gallo Associates, and commenced an action in Supreme Court, and sought a Yellowstone injunction, as provided by First National Stores Inc. v. Yellowstone Shopping Center Inc., 21 N.Y.2d 630 (1968).  In response, the landlord filed an answer and counterclaims containing a litany of alleged "breaches" going back to 2011 and even earlier, well before its ownership commenced in May 2015.

24. On March 30, 2017, the Supreme Court issued a Yellowstone injunction and memorialized it in a written Order filed April 12, 2017.  Thereafter, the tenant sought to cure alleged violations that were of relevance since May 2015, when defendants acquired the property:

9

Item:    On December 2016, we filed Alt-1 and Alt-2 plans and the landlord responded these were "deficient" and "improperly filed" (rather, as Alt-2 and Alt-1); and we took immediate corrective action with our retained architect, Jay Cho, preparing a modified set of plans.

Item:    In April 2017, prior counsel Mr. David Link (Gallo Associates) provided to the landlord, for review and execution, Department of Buildings PW2 work applications. Once again it was denied. Defendant landlord acknowledged receipt of  this package on May 3, 2017.  The landlord refused cooperation.

Item:    On June 5, 2017, in accordance with the landlord's request, the "Coversheet, Notes, Roof Plan," was submitted shortly thereafter on May 9, 2017 and, after receiving feedback form defendant's architect, revised plans which fully addressed defendant's architect's concerns were submitted. The landlord refused cooperation.

Item:    On May 9, 2017, plaintiff submitted, Alt-1 and Alt-2 plans. The landlord refused cooperation.

Item:    In June 2017, plaintiff submitted "Drawing Change Directives" and accompanying plans for your client's review. The landlord refused cooperation.

Item:    On October 11, 2017, plaintiff tenant submitted to the landlord two sets of plans prepared as Alt-1 and Alt-2 plans and requested sign off.  The landlord refused cooperation.

25. Defendants insisted that the premises be restored essentially to the status quo ante, 2009 or 2011 and refused landlord's sign off.  In the Supreme Court action, defendants asserted various counterclaims that invoked "breaches" going back years before they became the property owner, arguing the concept of "original sin," when in fact the prior landlord had approved of all prior alterations on the property, and deemed the tenant to be a "model tenant."

26. With the Yellowstone injunction in place since March 30, 2017, to provide a cure period for the tenant, while defendants continued to refuse cooperation with tenant's efforts

10

to cure alleged violations that were "currently existing," the defendants continued cooperation and filed an application with the Supreme Court to terminate the Yellowstone injunction on November 14, 2017.   After receiving papers, and expert materials from both sides, the Supreme Court conducted an evidentiary hearing on February 15, 2018, and found that the defendant-landlord had committed a classic breach of the covenant of good faith and fair dealing:

> THE COURT: All right. I have it.
>
> Here is what I am going to do with the Yellowstone.
>
> My understanding is that when this place was leased, it was with the clear understanding that it would be used as a restaurant space. I am going to set aside whether it's a restaurant with seating or without. I am going to assume it's without. Apparently, it would lease for a use that is not, according to your expert, plaintiff's expert, strictly in compliance with the codes.
>
> But it seems to me it was rented for that purpose, in that manner, and under those circumstances, the Court is not prepared to say that you, having rented it out of code compliance, you can now insist that they obtain a permit to use the space in the fashion, in the manner, and for the purpose for which it was rented a number of years ago.
>
> I realize you are owner, but it seems to me that this is one of those situations where if I were to enforce your contract, that's exactly what the breach of the covenant of good faith and fair dealings requirement is all about.
>
> And to the extent that you are trying to force them to get a permit for use, for which that facility was rented in the first place, would be inconsistent with that principle of law.
>
> so, to the extent you are seeking to enforce the lease or default them for violation of the lease on the grounds for which -- when I say the landlord, and I understand you are not the same, I get it would be in violation of that principle.
>
> So the Yellowstone, to that extent, will not be lifted and will be

continued. I think there is more to your claim in that, Mr. Silverbush, and I am
willing to hear what you have to say.

The testimony I have heard suggests or shows that the tenant is not
necessarily obligated to get the landlord sign-off for the kinds of changes that
you may need to get a certificate for. But we are about to talk about that.

Tr. 2-15-18, at 167-68.

27. The Supreme Court commented upon the landlord's consent to renovations since

January 2011 when plaintiffs occupied the premises:

THE COURT: Again, I am viewing the space before me as one of, you
know, compliance, what was the state of the building at the time they rented it
with the landlord's concurrence and consent, which I take to be January of 2011.

And that's kind of innocence where the world begins. With respect to
one, two, three of those, apparently there was Alt 2 certifications.

The Department of Buildings has not opined with respect to whether or
not those changes were compliant with the building code, but they, having been
filed and not challenged, they are presumptively compliant.

so that's where we are.

And then there is these two more that I can't tell whether or not the
landlord's consent was given or not given.

That's kind of where we are. But it is through that lens, Mr. silverbush,
that I am considering your application to lift the Yellowstone.

Tr. 2-15-18, at 171-72.

28. During the experts' testimony on February 15, 2018, plaintiff's expert Bryan Winter

told the Court the application did not require the owner's signoff; and defendant's counsel of

record made the same representation and the Court issued the February 15 order in reliance

upon defendant not interfering with plaintiff's DOB application process.   This colloquy

12

transpired:

>THE WITNESS: Two questions was, one with the determination require owner's sign-off. No. would the application require owner's signature? I would have to review every document, but I do believe that agency by the tenant would be accepted.

>THE COURT: Do you have a different view of that, Mr. Silverbush?

>MR. SILVERBUSH: I am embarrassed to say I didn't hear the answer, your Honor.

>THE COURT: He says he would have to look at the various documents, but he believes that landlord's signature to the application would not be required.

>MR. SILVERBUSH: I believe he is correct. In fact, I think Mr. Tang said that he has come across situations where the tenant signs the application because the Building Department doesn't check the veracity. If the tenant did that -- if it did that, we wouldn't know and we wouldn't be here.

>THE COURT: I am not here suggesting that we engage --

>MR. SILVERBUSH: Your Honor, we have all seen it done. I agree with Mr. winter in that respect.

Tr. 2-15-18 at 149-50.

29. The Court asked tenant's counsel Michael Kimm about his understanding whether the landlord's signoff was required and this colloquy occurred:

>THE COURT: Can I ask you [Mr. Silverbush] to put a pin in your argument. I want to ask Mr. Kim a question, and I will come back to you.

>Given what you heard today, Mr. Kimm, is it your belief that you need or do not need the landlord's sign-off for the work you need to do?

>MR. KIMM: I think I don't necessarily need it, Judge, but it would be nice to have it because the DOB practice has been evolving for the last couple of years more towards getting owners to sign off.

Two years ago I would have just said we file Alt 2 as a professional certification job and we are done. It's a little different, Judge. we are just trying to be a good tenant.

When the tenant is trying to be a good tenant and the landlord is saying, I am not going to sign off because five years from now, I've got to reset it, and is not cooperative, then we can never comply with the landlord's portion of the project, Judge.

THE COURT: Got it. Thank you, sir.

Tr. 2-15-18 at 176.

30. Defendant's expert Mr. Tang testified that Alt-2 could be filed within 8 weeks and, once the application is filed, then the DOB permit process can progress through the normal time table which likely would take more than 8 weeks for permit-approval through construction-completion:

THE COURT: They can do that?

MR. TANG: They can file within eight weeks.

THE COURT: Even though the work is not done?

MR. TANG: The construction work is after the permit. The process is, you file, you get the approval. The contractor obtains the permit for the work. The work is performed. And the work is inspected and signed off.

THE COURT: Alt 2?

MR. TANG: Alt 2.

THE COURT: That's Alt 2 approach. That is where you are talking about the so-called self-certification?

MR. TANG: Yes.

THE COURT: So you file the Alt 2. Your architect files that. Then the

14

contractors go out and get --

MR. TANG: Permits.

THE COURT: -- permits based on the filing.

MR. TANG: Based on the approved drawings.

THE COURT: Those are the drawings filed with the Department of Buildings and thereafter, the work gets done?

MR. TANG: Yes.

THE COURT: Okay. So the eight weeks doesn't work.

Let's go back to the drawing board.

MR. SILVERBUSH: The eight weeks would work for the certification, which I think --

MR. TANG: Eight weeks -- when I said eight weeks, it was for the plans to be filed with the Department and approved.

MR. KIMM: we can do that, Judge.

THE COURT: why do you need eight weeks to do that?

MR. KIMM: Because it requires an architect to review everything.

THE COURT: why can't he do that in a month, given -- especially the given the fact that you burned up 16 months?

MR. KIMM: I understand.

THE COURT: You have plans already.

MR. KIMM: I do, Judge. I have had plans in March, May --

Tr. 2-15-18 at 186-87.

31. The Court then reduced the 8 weeks to 4 weeks because plaintiff's alteration plans

15

had previously been prepared and plaintiff was ready to file. Id. at 187-88.   During that colloquy, Mr. Kimm and the Court had this further exchange concerning the filing of the plans without the new owner's signoff:

> THE COURT: why can't you do that in four weeks given your plans are already drafted? maybe there are minor changes you need to make.
>
> The reason I am giving you a hard time, sir, is because you have eaten up 16 months and done very little.
>
> MR. KIMM: It's only --
>
> THE COURT: You don't get much of a break at this point.
>
> MR. KIMM: I understand your Honor's concern.
>
> THE COURT: Good.
>
> MR. KIMM: I couldn't file the papers on my own, Judge. I needed the landlord to sign off.
>
> THE COURT: Actually, you could have. But it was not clear.

Tr. 2-15-18 at 188.

32. At that point, it was crystal clear that the Supreme Court's intention was to order the plaintiff to proceed to file Alt-2 plans within 4 weeks, as self-certification applications, without the owner's signoff.  Defendant and its team of lawyers remained silent.

33. With the Yellowstone injunction in place, and the Supreme Court held it to expire on March 15, 2018, the tenant was to proceed with Alt-2 plans filed with the Department of Buildings.

34. On February 27, 2018, plaintiffs's architect Jay Cho filed Alt-2 plans well ahead of

16

the March 15 deadline, for a full DOB plan review. The landlord sent a letter to the DOB on March 8, in order to interfere with the filing. Exhibit 9.  Had it not been for the defendants' interference and harassment, the filed plans would have encountered no problem with the DOB.

35. On February 27, 2018, soon after architect Jay Cho effectuated the filing, the DOB website shows that a complete ("ENTIRE") application package had been deemed filed:

**Last Action:** APPLICATION PROCESSED - ENTIRE 02/27/2018 (D)

Pre-Filed: 02/27/2018   Building Type: Other
Date Filed: 02/27/2018
Fee Structure: STANDARD
Review is requested under Building Code: Prior-to-1968

Estimated Total Cost: $45,000.00
Electronically Filed: Yes

Job Description   Comments

36. Defendants were to have refrained from interfering and harassing the tenant. Instead, on March 8, 2018, they wrote a letter on a Delshah Capital letterhead and told the DOB that there had been pre-existing violations on the property going as far back as 2005. Defendants filed the Delshah Capital letter to circumvent the Supreme Court's rulings based upon all of the evidence, and the defendant persisted in attempting to overturn the Supreme Court's ruling by further actions taken in the DOB.

37. As a direct result of defendants' interference, on April 11, 2018, the DOB issued a letter stating:

> **INTENT TO REVOKE APPROVALS AND PERMITS**
> **NOTICE OF ORDER TO STOP WORK IMMEDIATELY**
> **DUE TO OWNER DENIAL OF AUTHORIZATIONS.**

Exhibit 10.

17

38. Hours later, during the full view of customers and passers-by, a DOB enforcement agent came and issued a stop work order "due to owner denial of authorization." Exhibit 11.

39. On April 18, 2018, an enforcement agent of the DOB came and, in broad day light in the view of customers and passers-by, posted a large RED LETTERING NOTICE, "STOP WORK ORDER." Exhibit 12.  This was based on the "owner's denial of authorization."

40. Rather than letting the DOB process play out, defendants actively interfered with the DOB's review and presented a litany of "objections" identifying 22 items that had already been addressed or abandoned in the litigation, in their March 8, 2018, interference letter. Their letter falsely told the DOB that the plaintiff was currently in violation of many issues that had nothing to do with the defendants and never raised by the landlord, at the relevant times, by the prior landlord, O'Brien.

41. The March 8 letter to the DOB in particular, these acts of interference with the DOB process, falsely alleged that alterations had been undertaken by the tenant, without the landlord's consent; whereas in fact the landlord had been refusing each instance of consent requested, before the Supreme Court directed the tenant to file Alt-2 applications without the landlord's consent.

42. Between March 8, 2018, when Michael Shah wrote the letter falsely representing to the DOB that preexisting violations were their basis for refusing to signoff and never told the DOB that the Court had permitted plaintiff to proceed in the manner plaintiff did on February 27, 2018, using Alt-2 application for full examination by the DOB, and April 10, when plaintiff's plans were approved and alteration permits were issued, and April 14, when the

permits were rescinded, it is my understanding that Michael Shah made repeated phone calls

and visits to the DOB, "further to" his letter of March 8, directly interfering with the DOB plan

examination process and the matters that had been reviewed, re-reviewed, and re-re-reviewed

by the DOB along with plaintiff's architect Jay Cho and myself, as plaintiff's agent.

Item:   On March 9, 2018, plaintiff's architect Jay Cho received a Notice of Objections
from the DOB immediately after defendant's March 8 laundry list of objections.

Item:   On March 9, 2018, tenant's agent Fanny Chang spoke to FDNY Permit Unit to
expedite the TM5 and we received approvals on March 20, 2018.

Item:   On March 13, 2018, defendant then purported to serve a notice of rejection of
plaintiff's notice of filing, as though to somehow "contest" the elements of the
Alt2 plans that plaintiff filed with no participation or support from defendant,
who has steadfastly refused cooperation in the landlord-tenant relationship.

Item:   On March 13,  2018, tenant's agent Fanny Chang met with Rodney Gittens, one
of two Deputy Commissioners, along with Baharat Gami, the Chief Examiner,
and discussed the objections to the plans and review the new set of plans.

Item:   On March 15, 2018, architect Jay Cho and tenant's agent Fanny Chang met with
DOB Plan Review staff Peggy Liu to review all the objections of the plan and
review changes.

Item:   On March 20, 2018, tenant's agent Fanny Chang met with Commissioner Martin
Reboholz to discuss the objection and the kitchen and requested an AI for the
second floor kitchen, which he granted.

Item:   On March 27, 2018, tenant's agent Fanny Chang met with Deputy Commissioner
Joseph Bruno and a plan examiner and reviewed the objections and the plans.

Item:   On March 30, 2018, Mr. Cho and tenant's agent Fanny Chang met with Ms.
Peggy Liu , assistant to chief examiner to approve plans . We received approval
on the same date .

Item:   On April 10, 2018, the DOB issued permits to start work.

19

Item:   On April 14, 2018, the DOB rescinded the permits and issued a STOP WORK ORDER. Michael Shah's letters and phone calls generated internal audits.

Item:   On April 17, 2018, Deputy Commissioner Bruno told the enforcement staff:

Ms. Chang visited my office for homeowner's night and we discussed the progress on her store which is in the subject line.

She told me that you had reviewed the revisions to the plans that her applicant made in response to the audit objections that we issued. Although I changed the audit status to "Intent to Revoke", you should feel free to change the audit status to Audit Accepted when you are satisfied that the objections have been satisfied and you are ready to approve the PAA to address the objections of the failed audit.  You can also request that a letter of rescission of intent to revoke be issued at that time.

If there is any problem during your appointment, please feel free to walk in to me and we will work it out.

Item:   On April 19, 2018, at approximately 2PM, after repeated visits to the DOB, the DOB Deputy Commissioner Joseph Bruno issued a letter stating that the WORK STOP NOTICES issued and re-issued during the past two weeks, prompted by Michael Shah and Delshah Capital, have been resolved.

43.  Defendants were not finished with their interference.  They continued to claim that the DOB had no right to grant a permit where they had not consented.  Their actions were directly and proximately the cause of the DOB again revoking the work permit as of April 25, 2018.

## DEFENDANTS' SHAM 15 DAY NOTICE TO QUIT AND DEFENDANTS' SHAM "HOLDOVER ACTION"

44. On or about March 23, 2018, defendants initiated a purported 15 day notice to quit based upon their pretextual allegations of breaches going back several years. Exhibit 13.

20

Despite the pendency of the Supreme Court action, and despite the fact that the tenant had been in compliance with the lease, and only the defendant-landlord had been interfering with the performance of the lease by refusing to consent to reasonable alteration requests; by interfering with the filing process permitted by the Supreme Court; and by other matters, defendants continued with their pretextual eviction scheme.

45. Due to defendants' incessant interference and harassment, plaintiffs have incurred significant expenses, and the depletion of financial resources, and the ability to continue with their business operation.

## DEFENDANTS' VIOLATION OF THE FEDERAL RICO ACT

46. The United States Code, 18 U.S.C. § 1961, et seq., provides for civil liability for "racketeering" violations. While the term "racketeering" was borrowed from the days of rampant existence of organized crime when the federal statute was enacted, a civil plaintiff need not allege, much less prove, that a RICO defendant is remotely associated with "organized crime."

47. In the substantive federal statutory framework, 18 U.S.C. 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." To establish a civil RICO claim for violation of § 1962(c), a plaintiff must establish four elements at trial, namely that defendants (1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); see Cullen v.

Margiotta, 811 F.2d 698, 712-13 (2d Cir.), cert. denied, 483 U.S. 1021 (1987).

48.    In Reves v. Ernst & Young, 507 U.S. 170, 185 (1993), the Supreme Court held that, in order "to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs," under 18 U.S.C. §§ 1962(c), one must have some part in directing those affairs.  The term "participate" shows that RICO liability is not limited merely to those with "primary responsibility" for the enterprise's affairs, just as "directly or indirectly" indicates that RICO liability is not limited to those with a "formal position" in the enterprise, but some role in the "operation or management" in the enterprise is necessary to support liability.  An enterprise may be operated, for RICO purposes, by upper management, lower-rung members acting under the direction of management, or others "associated with" the enterprise who exert control over it, such as by bribery. See id. at 184-85.

49.    As Supreme Court has observed, "enterprise" and "pattern of racketeering activity" are separate and distinct concepts. United States v. Turkette, 452 U.S. 576, 583 (1981). "The existence of an enterprise at all times remains a separate element which must be proved by the [plaintiff]." Id.

50.    A "pattern" is established by showing at least two related events occurring within the past 10 years.  See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 237 (1989);  Cullen v. Margiotta, 811 F.2d at 713. Further, the predicate acts must be related and they must reveal continued, or the threat of continued, unlawful conduct:   It is this factor of relatedness plus continuity which combines to produce a "pattern." H.J. Inc., 492 U.S. at 239 (internal quotes omitted).  The purpose of the relationship and continuity requirements is to

22

"prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts."

United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc).

51.   Relatedness may be established by proof of "acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc., 492 U.S. at 240.

52. Continuity is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition," H.J. Inc., 492 U.S. at 241, and thus may be proved in a variety of ways, including by demonstrating a threat of continuity.  See id. at 242-43, 109 S.Ct. at 2902.

53.   "Racketeering activity" is defined as the commission of any of the specifically enumerated violations stated in 18 U.S.C. 1961.  This statute specifically includes "mail fraud" and "wire fraud" in violation of 18 U.S.C. 1391 and 1342, respectively.  Section 1391 states, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Section 1342 states in relevant part:

23

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

54. Civil RICO remedy is available to those who have been injured in their "business" or "property," as standing requirements are construed in the RICO context. Sedima, 473 U.S. at 496; Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992) (holding that RICO violation must be proximate cause of injury to business or property).   Plaintiff has suffered injury to its business in the form of lost revenue; enhanced operating costs; and professional fees that were otherwise unnecessary but for defendant's incessant campaign of unlawful termination of the tenancy using fraudulent, pretextual means.

55. The applicability of the RICO Act claims to these facts is supported by Buyers & Renters United to Save Harlem v. Pinnacle Group NY LLC, 575 F. Supp. 2d 499 (SDNY 2008) among other cases.

**The Racketeering Enterprise**

56.  The racketeering enterprise includes persons other than the defendant in addition to the defendant.  At all relevant times, the named defendants are associated in fact with unknown investors and "partners" of Michael Shah, who are members and associates of a group

24

of persons associated-in-fact, who engaged in mail fraud, wire fraud, and other racketeering

activities in this District and elsewhere, to further their self-interests.

57.    The group of individuals referenced above, including its membership and

associates, constituted an "enterprise," as defined by 18 U.S.C. § 1961(4) (hereinafter "the

enterprise"), composed of a group of individuals associated-in-fact.  This enterprise has had

an associational form different from the named defendants in that the named defendants

operated the business of owning and operating the building at 461 7 th Avenue, while the

enterprise was engaged in, and its activities affected, interstate commerce, in which the

enterprise controlled the tenancies through false and fraudulent actions.

### Purpose of the Enterprise

58.  The purpose of the enterprise included the following:

A. Coercively and unlawfully deriving higher store rents to which defendants

were not entitled;

B. Investing income derived from racketeering activity to expand its investment

portfolio in the New York metropolitan area;

C. Investing income derived from racketeering activity to expand defendants'

ownership of properties;

D. Promoting and enhancing the enterprise and the activities of its participants,

including each defendant, through financial benefits obtained by evicting plaintiff and other

tenants through improper and coercive means;

E. Promoting and enhancing the enterprise and the activities of its participants,

including each defendant, through social recognition and prestige in the New York City real estate industry by using improper and fraudulent means.

## Means and Methods of the Enterprise

59.  The members and associates of the enterprise, including the defendants, conducted and participated their affairs in furtherance of their unlawful enterprises by means of the following and others:

A. they committed two or more acts of wire fraud over a substantial period of time to facilitate fraudulently-obtained loans and induced plaintiffs to assume such loans, in violation of 18 U.S.C. 1343;

B. they committed two or more acts of mail fraud over a substantial period of time to facilitate fraudulently-obtained loans and fraudulently induced plaintiffs to assume such loans, in violation of 18 U.S.C. 1341;

C. they committed fraud upon the NYC Department of Buildings; and

D. they committed other actions in violation of the law.

## Pattern of Racketeering Activities

60.  Defendants, together with others known and unknown, being persons associated with the enterprise described above, which was an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, willfully, and knowingly conducted and participated, directly and indirectly, in the affairs of the enterprise through a pattern of racketeering activity, as set forth below.  Defendants conspired to disguise their unlawful conduct in the United States by cloaking their activities in false documents which are

26

disseminated in interstate and international commerce including emails, the interstate mail system, and the interstate wire facilities.

61. The pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisted of the following racketeering acts, committed over a substantial period of time, within the past ten years, with likelihood of continuing endlessly into the future.

### Racketeering Act One — Mail Fraud

62. Between May 2015 through January 19, 2017, for almost two years, defendants and the enterprise schemed to evict plaintiff using any means necessary to them, so as to install a higher-rent-paying tenant. Well before May 2015, when defendants purchased the subject building from its predecessor owner Timothy O'Brien, defendants had already decided that the "Korean deli" tenant would be evicted using any means, any reason that could be manufactured by them and their professionals.

63. Defendants purchased the building for $14 million using $5 million cash down-payment and obtaining a bank mortgage for $9 million. At the time, the rent-roll from the one and only tenant in the single-tenant commercial building was approximately $13,500 per year for store space that was barely 1500 square feet of ground floor space.

64. In contrast to the rent-roll, the monthly payment undertaken by defendants on the $9 million purchase-money mortgage was roughly $48,000 for principal and interest and $37,500 for interest only, on a 30 year amortization scenario with a 10 year balloon payment.

| | |
|---|---|
| Loan Amount ($): | $9,000,000 |
| Annual Interest Rate (%): | 5% |
| Amortization Term (Years): | 30 |

27

| | |
|---|---|
| Balloon Payment Due (Years): | 10 |
| P & I payment: | $48,313.95 |
| Interest-Only payment: | $37,500.00 |
| Balloon payment: | $7,320,795.81 |

https://www.mortgagecalculator.org/calcs/commercial.php

65. Upon information and belief, well before defendants purchased the subject building, they and certain professionals they intended to retain, or actually retained, began to "map out" the financial gains they would seek from a new tenant. In this connection, defendants intended to install a "pricey brand name tenant" who would also use the second floor rooftop to pay for a billboard advertising opportunity that did not exist in 2015 or when plaintiff began its tenancy in 2011.

66. Upon information and belief, defendants met with various professionals including lawyers at Rosenberg & Estes, and sought professional advice relating to the means and methods of evicting plaintiff from the tenancy well in advance of the end-of-term in 2024 under the written lease. To this end, defendants and their professionals engaged in sham "routine or maintenance inspections of the building" that were intended to collect evidence to be used in eviction proceedings. These efforts of defendants and their professionals culminated in January 2017.

67. On or about January 19, 2017, defendants served a 30 day notice to quit tenancy that contained eight pages of alleged "violations and breaches" of the lease, not since defendants acquired the subject building in May 2015, but going back years before they came to acquire the property on an "as is" basis. Exhibit 14. This 30 day notice contained material falsities and

28

its use, to seek an eviction, constituted a fraudulent and pretextual means. Defendants

transmitted this fraudulent document through the interstate mail and wire systems. The manner

of interstate transmission was by mailing the 30 day notice through the United States Postal

System on or about January 20, 2017, multiple times.

### Racketeering Act Two — Mail Fraud

68. On or about March 23, 2018, defendants served a 15 day notice of termination of

tenancy that contained 12 pages of alleged "violations and breaches" and attachments, regarding

plaintiff's rights under the store lease, involving matters not since defendants acquired the

subject building in May 2015, but going back years before they came to acquire the property

on an "as is" basis. This 15 day notice contained material falsities and its use, to seek an

eviction, constituted a fraudulent and pretextual means. Defendants transmitted this fraudulent

document through the interstate mail and wire systems. The manner of interstate transmission

was by mailing this 15 day notice through the United States Postal System on or about March

24, 2018, multiple times.

### Racketeering Act Three — Mail Fraud

69. On or about January 13, 2018, plaintiff obtained an affidavit from the prior landlord

Timothy O'Brien and filed it in Supreme Court, New York County. In relevant part, this

affidavit confirmed that the tenant had been approved from all alterations before defendants

became the new owners on or about May 15, 2015; that the tenant was a model tenant; and that

no violations existed of the tenancy:

      6. Before the property was sold to the new owner on May 15, 2015, all

alterations done to the Premises by or on behalf of the tenant were approved or not objected to by the Landlord.

7. On or about January 24, 2011, in consideration of Lessee (Plaintiff) undertaking to perform improvements to the Premises, I provided the Plaintiff with a monetary contribution of $20,000.00 on behalf of the Landlord to be utilized towards the costs of improvements at the subject Premises. The Plaintiff in fact completed the improvements to the subject Premises, and to my knowledge and belief. The areas of renovation include the staircase; the roof (equipment being placed upon the roof); and other parts of the property. At all times, the tenant discharged its responsibilities in a reasonable and diligent fashion and was a good tenant.

8. To my knowledge and belief, there were no objections asserted by or on behalf of the Landlord to any improvements made by the Plaintiff or any previous Tenant during the term of the subject Lease (up to and including the date of May 15, 2015) and in fact, consent was affirmatively given when requested by the Tenant. All consent given to tenant was permanent and not conditional.

70. On or about April 14, 2018, plaintiff received a letter dated April 13, 2018, through the Fed Ex delivery system, using interstate commerce, from Roger F. Weber, Esq., as counsel for Timothy O'Brien, stating in essence that the affidavit Mr. O'Brien had "sworn to" contained alleged falsities and inaccuracies. This letter was materially false in stating that "Mr.-O'Brien had unknowingly and mistakenly executed and delivered the Affidavit that was presented to him[,]" among other material falsities, as Mr. O'Brien executed the affidavit in Florida, where his vacation residence is located, where he voluntarily presented himself to a local notary public on his own time, with no one's coercion.

71. The reason for attorney Roger F. Weber's materially false letter dated April 13, 2018, was sent through the interstate commerce facilities, was due to defendants' communication with Mr. O'Brien, Roger Weber, Esq., or both. Upon information and belief,

after the January 13, 2018, filing of the O'Brien Affidavit by plaintiff, this fact was learned

immediately by defendants' counsel Bradley Silverbush, Esq., of Rosenberg Estes, then by their

clients, the defendants.   Upon information, over the course of the ensuing three months

between January 13, 2018, and April 13, 2018, defendants, principally by Michael Shah,

persuaded or coerced Timothy O'Brien, financially or otherwise, to claim that he did not intend

to write the facts confirmed in the O'Brien Affidavit.

72. Defendants thus directly caused Roger Weber Esq's letter dated April 13, 2018, to

be written; caused it to assert falsely and fraudulently that the O'Brien Affidavit had been

falsely made; and caused it to be sent through the instrumentalities of interstate commerce on

April 13, 2018, and on multiple occasions thereafter.

### Racketeering Act Four and Beyond

73.  Between May 2015 through now, and with their scheme of evicting plaintiff using

false and fraudulent pretextual means, defendants have used the interstate wire and mail

facilities to commit other acts of mail fraud and wire fraud.  Each of those was used in

furtherance of their grand scheme to evict plaintiff using any means they could under the guise

of "protecting the public" from a tenant that allegedly "violated" the NYC Building Code in

years when defendants had no ownership interest in the subject building.

### Open Ended Pattern

74. Defendants' commission of racketeering activity and the specific racketeering acts

were done under their scheme in an open-ended manner, with no duration, until their primary

objective was realized: to evict plaintiff and install a flagship tenant that would result in

significantly higher rent-roll and prestige to defendants, with the ultimately goal of reaping a windfall profit from the development 35th Street by Macy's or a contract-assignee of Macy's. Defendants are committed to using fraudulent, pretextual means to harass and evict plaintiff until plaintiff's tenancy period runs out in 2024.

## DEFENDANTS' MOTION FOR PERMISSIVE ABSTENTION

75. On June 20, 2018, defendants filed a motion for permissive abstention of this adversary action. ECF7. Defendants candidly admit that this action, filed-after the Chapter 11 case was commenced, and involving <u>federal law</u>, would not subject to mandatory adstention. Because defendants' motion is misplaced, it should be denied.

**I**

**DEFENDANTS' MOTION FOR "PERMISSIVE ABSTENTION" SHOULD BE DENIED BECAUSE DEFENDANTS' CAMPAIGN OF HARASSMENT AND RACKETEERING ACTS PLACED THE DEBTOR IN BANKRUPTCY REORGANIZATION AND THE EQUITIES ARE PALPABLY AGAINST THE DEFENDANTS**

76. Under 28 U.S.C. § 1334(b), district courts—and thus bankruptcy courts—have jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." <u>Stern v. Marshall</u>, 131 S. Ct. 2594, 2603, 180 L. Ed. 2d 475 (2011); <u>see</u> <u>Baker v. Simpson</u>, 613 F.3d 346, 350-51 (2d Cir. 2010). The three types of jurisdiction that the courts may exercise under § 1334 are "colloquially referred to as 'arising under,' 'arising in,' and 'related to' jurisdiction." <u>Lothian Cassidy, LLC v. Lothian Exploration & Dev. II, L.P.</u>, 487 B.R. 158, 2013 U.S. Dist. LEXIS 14464, 2013 WL 440103 (S.D.N.Y. 2013), <u>citing</u> <u>In re Ames Dep't Stores, Inc.</u>, 317 B.R. 260, 269 (Bankr. S.D.N.Y. 2004)). The three grounds are

further clarified as follows:

77. "Arising under" jurisdiction involves causes of action created by Title 11 of the Bankruptcy Code, meaning "'any matter under which a claim is made under a provision of [T]itle 11.'" Id. (quoting In re Salander-O'Reilly Galleries, LLC, 475 B.R. 9, 27 (S.D.N.Y. 2012)).

78. "Arising in" jurisdiction "covers claims that 'are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy.'" Baker, 613 F.3d at 350-51 (quoting In re Wood, 825 F.2d 90, 97 (5th Cir. 1987)). A claim arises in a bankruptcy proceeding if it "would have no practical existence but for the bankruptcy." Id. at 351 (quoting Grausz v. Englander, 321 F.3d 467, 471 (4th Cir. 2003)).

79. "Related to" jurisdiction is implicated where a the "outcome [of a claim] might have any 'conceivable effect' on the bankrupt estate." Parmalat Capital Fin. Ltd. v. Bank of Am. Corp., 639 F.3d 572, 579 (2d Cir. 2011) (quoting In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992)). Thus, an "action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." In re New 118th LLC, 396 B.R. 885, 890 (Bankr. S.D.N.Y. 2008) (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)).

80. Permissive abstention, based on 28 U.S.C. § 1334(c)(1), provides that, where federal jurisdiction exists, "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining

33

from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1).

81. In deciding whether to abstain on this ground, courts weigh considerations of comity and federalism, judicial economy, and efficiency, including:

> (1) the effect or lack thereof [**23] on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments [*513] to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on the court's docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

Lothian Cassidy, 487 B.R. at 165 (citations omitted).

82. Because federal courts have a "'virtually unflagging obligation . . . to exercise the jurisdiction given them,' and may abstain only for a few 'extraordinary and narrow exception[s],'" the courts should consider any abstention application carefully. In re WorldCom, 293 B.R. at 332 (quoting Colo. River Water Conserv. Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)).

A. Defendants' Conceded that the Adversary Action is Jurisdictionally

Properly Before the Court and thus Abstention is Not Supported

83. Defendants rely heavily upon a 20-plus year old District of Colorado case that

34

provides no analytical insights, <u>Sladek v. dePlomb</u>, 981 F. Supp. 1364, 1997 U.S. Dist. LEXIS 20385 (S. Colo. 1997). That case involved an alleged "oral lease" where the court apparently concluded that there was no related proof and the case was facing judgment in the state tenancy court, and thereby suggested that the RICO suit might be filed after <u>collateral estoppel</u> or <u>res judicata</u> was resolved. That case involved a Magistrate Judge's Report and Recommendation which appears to have already recommended dismissal of the RICO Act claims.

84. We have no such case as the RICO Act claim is not the subject of a Rule 12(b)(6) motion (such motion having been waived by not filing within the initial response period); and the state claims are far from even completion of discovery in the Supreme Court; far from even starting in the alleged "Holdover Action"; and the alleged state law issues are fully capable of being resolved along with the RICO Act claims in this Court. Indeed, once our adversary action is resolved, the "state law claims" will be effectively moot. Because our federal claims are properly vested before the Court, there is no basis for the "permissive abstention" at all.

85. Ultimately, this case is not about the validity or invalidity of a "store lease"; this case is about a successor-lessor who contrived sham "grounds" to have a model tenant evicted so as to recoup a poor financial investment made in the acquisition of the building, which was followed by the successor-owner's arrogant attempt to evict the model tenant to sell the property to Macy's, who might be re-developing the entire block. Where, as here, a landlord is seeking to evict a tenant not based upon some real violation of the lease, but seeks to evict a model tenant so as to sell the building to a high bidder in advance of the natural termination of the lease term, the landlord's acts are in <u>bad faith and inequitable</u>.

**II**

**DEFENDANTS' SHAM "HOLDOVER ACTION" IS FRIVOLOUS AND
WILL NOT PROCEED IN THE CIVIL COURT AS A MATTER OF LAW**

86. Ironically, even as defendants claim that they would rather resume in the Supreme

Court before Justice Peter Sherwood (which is itself in the middle of discovery; with

depositions not yet conducted), defendants filed a purported "Holdover Complaint." Exhibit

15.  Defendants' theorize, without analysis, that their purported "Holdover Action" will

somehow resume to the merits of the complaint they filed.  (Of course, there has been no

warrant of possession entered by any court, there being no basis for such relief.)

87. Defendants are flatly wrong about their belief that their purported holdover

complaint would somehow resume on its merits.  Their purported holdover petition is based

upon their purported 15-day notice that contains extensive "violations" going back to 2011 and

earlier.  These events not only precede defendants' ownership; these events precede even

plaintiff's own tenancy.

88. It is settled state law principle that, in order to maintain an action by summary

proceeding, the landlord must  "allege and prove that, as of the time the proceeding is

commenced, the tenant remains in possession beyond the expiration of his term. See  RPAPL

§ 711 [1]; Perrotta v. Western Regional Off-Track Betting Corp., 98 AD2d 1 (4th Dept 1983).

 As was discussed in Calvi v. Knutson, 195 A.D.2d 828, 830-831, 600 N.Y.S.2d 804, 1993

N.Y. App. Div. LEXIS 7513 (3d Dept 1993):

> . . . It is well established that because the summary proceeding is a remedy of
> statutory origin, it is available only in those situations enumerated in the statute,

36

namely, where a tenant (1) continues in possession after expiration of the lease term, (2) fails timely to pay rent, (3) maintains an illegal business at the demised premises, (4) is adjudicated a bankrupt or insolvent, (5) fails to pay agreed upon taxes and assessments levied upon the property in certain situations, or (6) disables smoke or fire detection apparatus in certain localities (RPAPL 711).

In this case, petitioners predicate their summary proceeding upon the holdover tenant theory, reasoning that the unauthorized sublease automatically terminated the lease or gave them the right to declare a lease termination and to resort to summary removal. However, HN2 in order to maintain a summary proceeding on this basis the landlord must allege and prove that the tenancy has expired prior to the time the proceeding is commenced (RPAPL 711 [1]). Expiration has been construed to mean expiration by lapse of time, i.e., by natural [***6] conclusion of the lease term or by operation of a conditional limitation contained in the lease document which works an automatic termination of the tenancy upon the happening of a specified event. HN3 A termination resulting from the landlord's option to exercise his or her reserved right of reentry upon the tenant's breach of a lease covenant, because it is not an expiration by lapse of time, consistently has been recognized not to be an expiration within the meaning of RPAPL 711 (1) (see, Beach v Nixon, 9 NY 35; Matter of Ranalli v Burns, 157 AD2d 936; Perrotta v Western Regional Off-Track Betting Corp., 98 AD2d 1; Goldberg v Levine, 199 App Div 292, 294-296; Lamlon Dev. Corp. v Owens, 141 Misc 2d 287; Matter of Farone v Burns, 27 Misc 2d 998; see generally, 2 Rasch, New York Landlord and Tenant--Summary Proceedings § 30:3-30:5, at 434-436 [3d ed]).

Because a reading of this lease establishes that the term did not expire until 1992, and a review of the default provisions reveals that petitioners are accorded only the right of reentry upon breach of a lease condition, it is evident that petitioners have failed to satisfy [***7] their burden of proving entitlement to summary relief. Their remedy was an action pursuant to RPAPL article 6 for ejectment (see, e.g., Beach v Nixon, supra; Nathan's Famous v Frankorama, Inc., 70 Misc 2d 452, 455). Moreover, inasmuch as County Court does not have subject matter jurisdiction over an RPAPL article 6 action (see, NY Const, art VI, § 11; Judiciary Law § 190; Piekelko v Lake View Brewing Co., 65 Misc 365), conversion of the summary proceeding into an ejectment action (CPLR 103 [c]) as an alternative to dismissal of the petition is not an available option.

(Emphasis added.)

89. Our lease did not "naturally expire" by operation of a "date"; rather defendants have

37

been trumping up alleged "breaches" of absurdest kinds going back to 2009 as their "grounds" for violating the lease which they did not even have until May 2015, when they acquired the building. See Exhibit 14 (30 day notice); Exhibit 13 (15 day notice).

90. Because the lease did not naturally expire by operation of a lapse of date, the defendants would have, at most, an action for ejectment.  Since the landlord is seeking reentry based upon some alleged "condition of the lease," having been allegedly breached by the tenant, it requires a plenary suit. In the Matter of Watervliet Housing Authority v.  Bell, 262 AD2d 810 (3d Dept 1999).   Thus, yet again, defendants are the ones dragging plaintiffs through the various court systems in search of a "forum" where a busy state court judge, assigned with overwhelming case load, might err in their favor and grant relief where none is supported.

91. As discussed in LLDP Realty Co., LLC v. AGHR Enters. LLC, 44 Misc. 3d 716, 989 N.Y.S.2d 583, 2014 N.Y. Misc. LEXIS 3027, 2014 NY Slip Op 24182, 2014 WL 3376876 (Kings County Supreme Court 2014) "breach of lease" allegations do not provide for a summary proceeding:

> When the lease creates a condition subsequent petitioner must commence  [***4] an action pursuant to Article 6 of the RPAPL, which is essentially a common-law ejectment action (451 Rescue LLC v Rodriguez, 15 Misc 3d 1140[A], 841 NYS2d 819, 2007 NY Slip Op 51062[U] [2007]). Such ejectment action must generally be commenced in Supreme Court, except the New York City Civil Court has jurisdiction of the action where the assessed valuation of the real property does not exceed $25,000 (NY City Civ Ct Act § 203 [j]; 90 NY Jur 2d, Real Property—Possessory Actions § 357).

> Here, the landlord commenced this summary holdover proceeding seeking to exercise its alleged right of termination under section 15.09 of the lease which states, "Any breach of this Section 15 [Assignment, Subletting and Mortgaging] by Tenant shall constitute a material default [****3]  under this

38

Lease entitling Landlord to all rights and remedjies [sic] in respect hereto, including without limitation the right to terminate this lease." Since the term of the subject lease, which expires in 2018, has not yet run, and the default provision in section 15 [*719]  provides petitioner the right of reentry upon breach of the lease, absent a right to cure, the lease creates a condition subsequent and petitioner is not entitled to summary relief under article 7 of the RPAPL [***5] (see Matter of Calvi v Knutson, 195 AD2d at 831; 451 Rescue LLC v Rodriguez, 15 Misc 3d 1140[A], 841 NYS2d 819, 2007 NY Slip Op 51062[U]). Therefore, on these facts, the petitioner landlord must proceed in a plenary action for ejectment under article 6 of the RPAPL and cannot maintain a summary proceeding under article 7 of the RPAPL.

92. In their zeal to seek a "quick fix eviction" through the Civil Court, defendants have filed a complicated "holdover petition" that is not based upon a "holdover" at all but one that requires detailed analyses of the allegations they raise, going as far back as 2009 when plaintiffs were not even a tenant.  However, that "holdover action" and the Supreme Court action need not proceed; and will be rendered moot by the adversary action.

### III

**DEFENDANTS' APPLICATION FOR EQUITABLE RELIEF SHOULD BE DENIED DUE TO THEIR FAILURE TO ACT IN AN EQUITABLE MANNER UNDER THE DOCTRINE OF UNCLEAN HANDS**

93. Defendants concede that the motion they seek is vested in the Court's wide discretion.  As a Court of equity, the Court's equitable powers are being invoked by the defendants who do not challenge the viability of plaintiffs' complaint asserting (1) RICO Act claims and (2) harassment-of-tenant claims.  Both claims clearly implicate equitable factors. The landlord's actions trigger the equity maxim: a party that seeks equity must have done equity!  Courts apply the doctrine of unclean hands when "'some unconscionable act of one coming for relief has immediate and necessary relation to the equity that' the party seeks." In

39

re New Valley Corp., 181 F.3d 517, 525 (3d Cir. 1999) (quoting Keystone Driller Co. v. Gen.

Excavator Co., 290 U.S. 240, 245, 54 S. Ct. 146, 78 L. Ed. 293, 1934 Dec. Comm'r Pat. 639

(1933)).

94.  The challenged conduct must be "offensive to the dictates of natural justice."

Keystone, 290 U.S. at 245. The doctrine is only applicable against a party that seeks

affirmative relief, as defendants do here. Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d

160, 174 (3d Cir. 2001) (citing Keystone, 290 U.S. at 245). If a court finds that a party comes

before it with unclean hands, the remedy that the party seeks will be withheld. Keystone, 290

U.S. at 245. Courts "apply the maxim, not by way of punishment for extraneous transgressions,

but upon considerations that make for the advancement of right and justice." Id.

95.  The Court should conduct an evidentiary hearing on defendants' attempt to sell the

building to a re-developer, or to re-develop it by immediately ousting the plaintiff-tenant,

whose lease naturally runs for at least six more years.  Plaintiffs are not defendants' bankers

and are not answerable to defendants' shareholders other than paying the rent and conducting

business responsibly and legally.  Courts of equity abhor technical forfeitures.  Judge Gerber

discussed forfeiture of a store lease, upon some hypertechnical "default" as strongly

disfavored in the Second Circuit:

> The Ames Debtors seek summary judgment on the further ground that
> forfeiture of the Falls Church Store Lease would be violative of the equitable
> doctrine disfavoring the forfeiture of leases. HN11 In Virginia, as elsewhere,
> "equity generally abhors a forfeiture." Pence v. Tidewater Townsite Corp., 127
> Va. 447, 103 S.E. 694 (Va. 1920); cf. Duncan v. G.E.W., Inc., 526 A.2d 1358
> (D.C. 1987) ("all three jurisdictions [District of Columbia, Maryland and
> Virginia] abhor a forfeiture and will permit equity to intervene if the

40

circumstances are compelling" citing <u>McClellan v. Ashley</u>, 200 Va. 38, 104 S.E.2d 55, 58 (Va. 1958)).

In <u>McClellan</u>, where (unlike here), a tenant had missed the deadline for exercise of an option to renew a commercial lease, due to "mere inadvertent neglect," id. at 57, the court declined to grant relief of the forfeiture, but it stated that in circumstances where there are "equitable grounds for such relief, such as fraud, mistake, surprise [**44]  or accident," equity could properly "relieve the lessee of the consequences of his failure to give the [proper] notice." Here, where timely notice was given and the deficiency, if it was a deficiency, was the failure only to expressly specify the exact tenant of record, and where there was no doubt as the lease in question and the intent to extend, the Court believes that this is a classic example of nothing more than mistake, and (since, the Landlord's May 2001 position was a reversal of its position in February 1998, when it acknowledged the validity of the 1995 extension, in the same manner), surprise -- even if it were to be assumed that the Virginia Supreme Court's recitation of a seemingly non-exclusive list ("such as") were in any way restrictive. 36Link to the text of the note Indeed, in <u>Sentara Enterprises, Inc. v. CCP Associates</u>, 243 Va. 39, 413 S.E.2d 595 (Va. 1992), the Virginia Supreme Court observed that despite a tenant's negligence in connection with a lease extension, the anti-forfeiture doctrine still could apply if such negligence resulted from the tenant's mistake or was affected "by the landlord's conduct," 413 S.E.2d at 597-598 -- both of which the Court has no trouble [**45]  finding here. With the Landlord having acknowledged the effectiveness of the December 1995 extension without complaint, and with the Landlord having failed to timely notify the tenant of the claimed deficiency upon receipt of the December 2000 Exercise Letter, this is, in the Court's view, a classic case for the application of those principles.

The Second Circuit has noted that "bankruptcy courts, as courts of equity, should look with disfavor on contract forfeitures." <u>In re Lavigne</u>, 114 F.3d 379, 387 (2d Cir. 1997). [**46]  While that principle necessarily has limits, and in particular cannot be regarded as a license to disregard material breaches of contract, here we are faced with no such thing. Once more, this is not, in any way, about depriving a party of the fruits of its contract, or the benefit of its bargain. It is, rather, about the Landlord's effort to deprive its contract counterparty of the fruits of its contract by seizing on what was a technical mistake, at best, and evade its side of the bargain when it no longer finds the contract to its liking.

<u>Capital Commer. Props. v. Ames Realty II (in Re Ames Dep't Stores )</u>, 288 B.R. 339, 354-55,

2003 Bankr. LEXIS 75 (S.D.N.Y. 2003) (Gerber, BJ).  Defendants' attempt to declare the lease "breached" or "in default" on the basis of construction plan irregularity alleged to have occurred years ago, against the then-owner's sworn declaration that plaintiffs have been a model tenant with no violations, cannot support a forfeiture.

### IV

### THE COURT SHOULD PREVENT DEFENDANTS FROM LITIGATING PLAINTIFFS IN MULTIPLE FORUMS, IN THE HOPES OF PREVAILING THROUGH A "WAR OF ATTRITION"

96.  Defendants having spent excessively to acquire the building for pure speculation with Macy's redevelopment, it is clear that defendants are willing to spend countless millions of dollars to wage a war of attrition which began with their overpayment; their retention of professionals to contriver eviction grounds, and so forth.  Defendants are so financially capable of extinguishing plaintiffs' limited financial resources from a meager sales revenue that having to fight them in multiple forums is oppressive and overwhelming for the plaintiffs.  Plaintiffs do not have the financial means of fighting defendants with "tooth and nail."  The Court should not permit the defendants to further deplete plaintiffs' resources in their endless war of attrition.

97.  We will be ready to proceed with an evidentiary hearing promptly.  The Court should either deny defendants' motion outright or deny it after an evidentiary hearing.

42

## CONCLUSION

For the foregoing reasons, the Court should deny defendants' discretionary motion for "permissive abstention."

Dated: July 2, 2018                              Respectfully submitted,

                                                 /s/ Michael Kimm

                                                 Michael S. Kimm, Esq.
                                                 msk@kimmlaw.com
                                                 KIMM LAW FIRM
                                                 333 Sylvan Avenue, Suite 106
                                                 Englewood Cliffs, New Jersey 07632
                                                 T: 201-569-2880
                                                 *Attorneys for Plaintiffs*